Jerry Lynn **BRADDOCK,**
**Sr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–98–00243–CR.**

Court of Appeals of Texas,
Texarkana.

Argued Aug. 24, 1999.

Decided Aug. 31, 1999.

---

Clifton L. Holmes, Eric Albritton, Holmes Law Office, Longview, for appellant.

Charles C. Bailey, Dist. Atty., Mt. Pleasant, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice ROSS.

Jerry Lynn Braddock, Sr. appeals from a judgment of conviction for the offense of murder. A jury determined his guilt and assessed punishment at imprisonment for thirty-five years. He appeals, contending that the trial court erred in: (1) failing to

file findings of fact and conclusions of law as to the voluntariness of oral statements made by him to law enforcement officers at the scene of the crime; and (2) allowing the introduction of oral statements made by him to one particular law enforcement officer because he was not properly warned.

On December 26, 1997, the Titus County Sheriff's Office arrested Braddock for the shooting death of Dwayne Wilson, which occurred on that same date. Before this date, Wilson and Braddock's daughter, Kristy, had been involved romantically, and had lived together and separated on numerous occasions. On December 21, 1997, Wilson assaulted Kristy. On December 26, Braddock returned home from a fishing trip and learned of the assault. Braddock called Wilson regarding the assault on his daughter. Wilson told Braddock there was nothing Braddock could do about it and called him an "old fossil." During the night of the same date as this telephone conversation, Kristy called Braddock and told him that Wilson had just driven up in front of her home. Kristy's home was located within 100 feet of Braddock's home. Kristy had spoken with Wilson earlier that night by telephone and had told him to leave her alone. Braddock went outside with his shotgun and confronted Wilson. Braddock testified that Wilson reached into his pocket and that he shot him because he feared for his life.

During trial, the court held a hearing outside the presence of the jury to determine the admissibility of certain oral statements made by Braddock at the scene. As part of his investigation of the shooting, Clyde Parker, a reserve deputy sheriff, made contact with Braddock at his home. Parker testified for the State in relevant part as follows:

Q   And did you go ... to the defendant's residence?

A   Yes, sir, I did.

Q   What did you do when you got there?

A   I knocked on the door and the subject came to the door. And I asked him, you know, did he know where the subject was that done the shooting. And he asked me in, so I went inside.

Q   What did he say to you once inside?

A   He said "you know what happened." And it kind of stunned me, because from talking to Lieutenant Abston I was thinking it was someone else involved. So I stood there and he said "Well, I've just been waiting, drinking a beer waiting on y'all."

. . . .

Q   Did you, in fact, really know what happened at that time?

A   No, sir, I did not.

Q   In connection with that statement ... did he say anything else?

A   No. After talking to him a few minutes more he said that he was the one—"He was waiting for us to come get him. He was just drinking a beer waiting on us." And at that time I told him that I would have to read him his rights. He said for me to do what I had to do. So I advised him of his rights. Then I told him I would have to place the handcuffs on him and he just stood there while I handcuffed him.

Q   Did you ask him where the gun was?

A   Yes, sir. I asked him where was the weapon that was involved and he answered that he wasn't going to say anything about that.

. . . .

Q   After he said that he didn't want to say where the gun was did he say anything else?

A   Not at that time, no, not to me.

Q   Did you stop questioning him at that time?

A   Yes, sir, I did.

. . . .

Q  Okay. So can you tell the Court that that's what he said?

A  Yes, sir.... [H]e said "You know what happened. I'm not going to hide it.". . . .

Parker further testified for the State as follows:

Q  When you say that you read him his rights, did you have a card to read those from?

A  No, sir, I have them memorized.

Q  . . . What did you recite to him?

A  That he had the right to remain silent. Anything he said can and will be used against him in a court of law. He has a right to have an attorney before or during any questioning, if he so desires. If he does—cannot afford an attorney at the time, that one will be appointed to represent him by the Court.

The next day, during a continuation of the same hearing, Parker testified as follows in response to Braddock's questioning:

Q  Yesterday when you recited those you did not tell us that you informed him that he had the right to terminate the interview at anytime.

A  Yes, sir. I wasn't questioning him. I was just advising him he was under arrest.

Q  But you did not tell him he had the right to terminate the questioning of the interview at anytime, did you?

A  No, sir, because I wasn't going to question the subject.

Q  I mean, you're telling me you didn't tell him that night.

A  Yes, sir, that's true.

Mark Alexander, chief of the criminal investigation division of the Titus County Sheriff's Department, testified at this hearing that, upon his arrival at the scene, he observed Parker and another deputy escorting a male from the residence. He then continued his testimony, in relevant part, as follows:

Q  Was he handcuffed at that time?

A  Yes, sir, it appeared that he was.....

Q  What did you do at that point?

A  . . . I also spoke with Deputy Parker and was advised that the subject he had been escorting was Jerry Braddock, Sr. and that based upon information they had gotten at the scene they felt like he might be, you know, the perpetrator in that case.

Q  What did you do after that?

A  I went over and instructed them to go ahead and open up the patrol car and got him out; told them they were going to need to rehandcuff Mr. Braddock in the front. I told Mr. Braddock that he was not under arrest at that point in time, that he was being detained until I could sort everything out and take care of the investigation.

Q  Did he make any response to that?

A  . . . [H]e wanted to know basically why I was at the scene, because everybody knew what had happened.....

   . . . .

A  . . . [A]nd he was asking "Well, what are you doing here?", and I had told him, like I said, what my job was, he said "Well, what do you need to know?" And at that time I wanted to make sure that he'd already been advised of his rights. Deputy Parker had told me that he was, but I asked Mr. Braddock "Have these officers advised you of your rights?" "Yes, he has." "Did you understand them?" "Yes, I did." I said "Well, would you be willing to talk to me about it to figure out what everything that happened here was?" And he said that he would.

Q  Did you explain to him that you needed to find the gun?

A  Yes, sir.....

Q  What did he do?

A  Initially he just—he said "Well," motioned like away from the car from where we were standing. I said "Well, what?" And he just motioned again. I said "Well, are you going to show me where the gun is? Because I need to get it recovered." He said "Yeah, come on." . . . .

Q  And you asked Deputy Parker to go with you?

A  Yes, sir.

Q  And where did the defendant take you?

A  To a location just to the back of his house. There's a woodline there. And he indicated that he had thrown the shotgun out there in the woods, but he didn't know the exact location. So we stood there and I shined my flashlight around and I ended up seeing what looked like the butt of a shotgun. . . . And I said is that it and he said yeah.

Q  Did you know where that was prior to him showing you . . . ?

A  No, sir. No, sir.

   . . . .

Q  Once you found the gun, did the defendant make any statements to you about confirming that's the gun he used?

A  Yes, sir. I simply asked him is that the gun and he said yeah.

   . . . .

Q  The question is, did you ask him that night what type of gun that was?

A  Yes, sir.

Q  And what did he tell you?

A  The comment was made that it was a .12 gauge and not a .20 gauge.

Q  Did you check to see if he knew what type it was, to confirm whether or not he was aware of what kind of gun it was?

A  I had made the comment about it being .00 buckshot and that's when he advised me that it was .000 buckshot not .00 buckshot.

Q  Once you got him back to the patrol car did you hear him mumble anything and then ask him what he said?

A  Yes, sir.

Q  What did he respond when you asked him what he was mumbling?

A  He made a statement to the effect that the defendant [sic] should have just stayed away from him and not messed with him and it never would have happened.

Q  Did he make any statement about his age and whether he could fight himself?

A  Yes, sir. He stated that he was an old man, that he couldn't fight; the victim, the victim was younger than him, and he did the only thing that he could.

Q  Did he also make the statement that you knew what he'd done, so the only thing left to do was to go to the station?

A  Yes, sir.

Q  Did he make the statement there was no altercation between anyone that evening?

A  Yes, sir.

Braddock objected to the admissibility of these oral statements made by him to Parker and Alexander, but the court overruled his objections. Braddock then specifically asked for findings of fact and conclusions of law, to which the court responded:

I'm required to do that and I'll do that before the case goes up. I want to make clear by this ruling now I find the statement was voluntary. I don't have any evidence that it was induced by any threat, persuasion or coercion, that it was anything but voluntary. . . . .

■■■ In his first point of error, Braddock contends that the trial court erred in failing to file findings of fact and conclusions of law, as required by Tex.Code Crim. Proc.

ANN. art. 38.22, § 6,[1] as to the voluntariness of Braddock's oral statements made to Alexander. He argues that the court's commentary as to why it was denying the motion to suppress and allowing the statements into evidence is merely conclusory with no facts stated as the basis for its conclusions. Therefore, he argues, there is no basis upon which to review the trial court's application of the law to the facts and this appeal should be abated with directions to the trial judge to file findings regarding this issue.

Article 38.21 of the Code of Criminal Procedure provides as follows:

A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed.

TEX.CODE CRIM. PROC. ANN. art. 38.21 (Vernon 1979). Additionally, Article 38.22, § 5 provides:

Nothing in this article precludes the admission of a statement made by the accused ... that is the res gestae of the arrest or of the offense, or of a statement that does not stem from custodial interrogation, ....

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 1979).

Braddock points to nothing in the record where he contested the voluntariness of his statements as being the result of compulsion or persuasion. He argues, however, that his statements are inadmissible because he was not admonished that he had the right to terminate the interview at any time. Where the record reveals that an appellant failed to specifically object to the admissibility of a statement as being involuntary and did not present any evidence on the issue, the trial court need not make findings of fact and conclusions of law pursuant to Article 38.22, § 6. See Lindley v. State, 635 S.W.2d 541, 544–45 (Tex.Crim.App. [Panel Op.] 1982); Jones v. State, 859 S.W.2d 537, 541 (Tex.App.-Houston [1st Dist.] 1993, pet. ref'd). Even if we accept Braddock's argument that his statements were involuntary because he was not properly warned, his argument fails. Article 38.22, § 3(c) reads as follows:

Subsection (a) of this section [providing that no written custodial statement by an accused is admissible unless it shows that the accused received certain warnings, including that he has the right to terminate the interview at any time] shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed.

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(c) (Vernon Supp.1999). The only warnings which must precede an oral confession admitted under Section 3(c) are the Miranda warnings.[2] Robertson v. State, 871 S.W.2d

---

1. TEX.CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 1979) reads in relevant part as follows:

In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause.

2. The warnings required by Miranda to be given prior to custodial interrogation include the following: that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

701, 714 (Tex.Crim.App.1993). The right to terminate the interview at any time is not a right among those expressly required by *Miranda*. *Id.* at 713. In this case, Braddock's statements about the location of the gun and the type of buckshot used in the shooting are the only statements at issue that were not admissible as spontaneous declarations (not the result of custodial interrogation) or as res gestae to the arrest,[3] but rather were admissible pursuant to Article 38.22, § 3(c). The *Miranda* warnings given to Braddock were sufficient under this section and, thus, his statements were not involuntary. Therefore, he presented no challenge to the voluntariness of his statements and the trial court was not required to file findings of fact and conclusions of law. This point of error is overruled.

In his second point of error, Braddock contends that the trial court erred in allowing the introduction of certain oral statements made by him to Alexander because he was not properly warned in accordance with TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3 (Vernon Supp.1999) and *Miranda*. Specifically, he argues that Parker did not inform him of his right to terminate the interview at any time. He further argues that the statements are not admissible because they were not recorded, as required by Article 38.22, § 3.

■ Alexander testified at trial as follows regarding statements made to him by Braddock:

Q  Did he ask you any questions as to why you were there?

A  ... he wanted to know why I needed to be at the scene.

Q  What did you tell him?

A  I told him because I had to figure out what had happened, it was my responsibility. I would be assigned investigative responsibility for the case.

Q  Did he make any response to that?

A  The response had been "Well, what do you need to be here for, everybody knows what happens—everybody knows what happened."

In spite of Alexander's assurances to Braddock to the contrary, Braddock was clearly in custody at the time he was questioned by Alexander. However, we find that the admission of these oral statements by Braddock was not error for several reasons.

First, it is evident from the record of the suppression hearing that Braddock's statement to Alexander, "Well, what do you need to be here for, everybody knows what happens—everybody knows what happened" was made initially to Parker when Parker first arrived at Braddock's house and prior to any custodial situation. Alexander's preface to his quotation of Braddock's statement that, "The response had been ...." clearly suggests a reference to the res gestae context in which Braddock's statement was first made. Further, this particular statement by Braddock is not one which on its face is incriminating. It can be interpreted to mean several different things. Braddock's own counsel stated at the suppression hearing:

MR. OLD:.... I mean, basically, every statement he made is a general statement. He did not—I mean, you have to read something else into it to get to where they want to go. Officer Parker simply testified Mr. Bragg (sic)

---

**3.** Statements in these categories are admissible whether or not warnings listed in TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (Vernon 1979) were given. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 1979); *see also Jefferson v. State*, 974 S.W.2d 887, 890–91 (Tex.App.-Austin 1998, no pet.) (holding that defendant was not deprived of his Fifth Amendment rights where his statements were volunteered and not the result of custodial interrogation or its functional equivalent); *Higgins v. State*, 924 S.W.2d 739 (Tex.App.-Texarkana 1996, pet. ref'd) (holding that defendant's spontaneous statement made while in custody and in the back seat of a police car was voluntary and, thus, admissible where it was not the result of coercive police conduct and was made freely and voluntarily and without questioning by law enforcement officials).

said "You know what happened; I'm not going to hide it." I mean, whether he's speaking for himself or somebody else is not in it.

No error has been shown in the admission of this statement.

Alexander continued testifying at trial as follows:

Q  Did you talk more specifically about any gun at that time?

. . . .

Q  What did you explain to him about a shotgun?

A  . . . [T]hat I'd already observed that a shotgun had been used; . . . and that we needed, for everybody's safety, there's a gun floating around out there that I don't know where it's at. . . .

Q  Did he respond to that?

A  He indicated, kind of motioned off away from the car, and said come on. . . . . Are you going to show me where it's at? He said, yeah. . . . .

. . . .

A  . . . . I said is that it? He said yeah.

Q  What statements did he make to you about using that shotgun at that time?

A  Prior to getting to where the shotgun was located I had made a statement about part of the reason why I needed to recover it was that this thing had, you know, .00 buckshot in it. And the defendant corrected me and stated that "No, that it was .000 buckshot."

As already stated in our discussion of Braddock's first point of error, these statements fall under Article 38.22, § 3(c) because they contain assertions of fact or circumstances that were found to be true and which conduced to establish Braddock's guilt, "such as the finding of . . . the instrument with which he [the accused] states the offense was committed." *See*

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(c). As such, a warning of his right to terminate the interview at any time was not required. Braddock was given all of the warnings required by *Miranda*, and this was sufficient. *See Robertson*, 871 S.W.2d at 714.

■  Alexander next testified as follows:

Q  Did you ask him about that evening, whether there had been any fighting or threats between himself and Robert Dwayne Wilson, or Robert Dwayne Wilson and his daughter Kristy Braddock?

. . . .

A  I asked him if there had been anything between himself and Robert Wilson. He stated no. I asked him had there been any problems that evening between his daughter and Robert Wilson. He stated no to that also.

Q  Did you ask him if Robert Dwayne Wilson had threatened him or his daughter that evening?

. . . .

A  He answered no.

Q  What did he describe to you about how this took place?

A  The basic statement he said was something to the effect that he should have just stayed away and this never would have happened.

These statements by Braddock about which Alexander testified at trial, although not word for word the same, are essentially the same as testified to by Alexander at the suppression hearing (see page 8 of this opinion). At the suppression hearing, these statements were not presented as having been made in the context of custodial interrogation and the trial court ruled them admissible. As presented at trial, these statements appeared to be the result of custodial interrogation, but Braddock made no objection to their admission.

■  The general rule is that an objection to evidence made at a hearing on a

motion to suppress preserves any error in the admission of that evidence at trial without further objection. *See Gonzales v. State,* 685 S.W.2d 47, 50 (Tex.Crim.App. 1985). However, when that evidence is presented in a different context at trial that makes the court's ruling at the suppression hearing, although correct when made, an erroneous ruling at trial, such error is waived if the movant fails to object at trial. This is because the trial judge should be given an opportunity to rule on the admissibility of this evidence in the different context in which it was presented at trial. *See Rezac v. State,* 782 S.W.2d 869, 871 (Tex.Crim.App.1990); *Kaufman v. State,* 901 S.W.2d 653, 655 (Tex.App.-El Paso 1995, pet. ref'd). In the context in which these statements by Braddock were presented at the suppression hearing, the court did not err in overruling his objection. Since Braddock made no objection when they were presented at trial that they were made as a result of custodial interrogation, the judge never had an opportunity to make a ruling on their admissibility in that context. Any error in their admission was waived.

 Even if error had not been waived, we cannot say that the admission of these particular statements by Braddock had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997). Therefore, considering the record as a whole, we find that any error in their admission was harmless. *See Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

Braddock also contends that all the statements made to Alexander were inadmissible because they were not electronically recorded, as required by Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a). We overrule this contention based on the same analysis made in disposition of his other contentions. In addition, we reject this particular contention because he raises it for the first time on appeal. The record shows that he objected to the ad-

mission of these statements at the trial level because he did not receive the warning required by Article 38.22 of the Code of Criminal Procedure, not because of any failure to record the statements. A complaint on appeal must comport with the complaint made at trial or error is waived. *Santellan v. State,* 939 S.W.2d 155, 171 (Tex.Crim.App.1997); *Hughbank v. State,* 967 S.W.2d 940, 944 (Tex.App.-Fort Worth 1998, no pet.). We overrule this point of error.

The judgment is affirmed.